1  Adam C. McCall
   LEVI & KORSINSKY LLP
2  445 South Figueroa Street, 31st Floor
3  Los Angeles, CA 90071
   Tel: (213) 985-7290
4  Fax (202) 333-2121

5
   Laurence M. Rosen, Esq. (SBN 219683)
6  THE ROSEN LAW FIRM, P.A.
7  355 South Grand Avenue, Suite 2450
   Los Angeles, CA 90071
8  Telephone: (213) 785-2610
   Facsimile: (213) 226-4684
9

10 *Co-Lead Counsel for Lead Plaintiffs*

11            UNITED STATES DISTRICT COURT
12         FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14 ROBERT FORD, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | No. 2:16-cv-00255-TJH-AFM |
| 17  Plaintiff, | <u>CLASS ACTION</u> |
| 18  vs. | JUDGE: Hon. Terry J. Hatter, Jr. |
| 19 NATURAL HEALTH TRENDS CORP., CHRIS T. SHARNG, and TIMOTHY S. DAVIDSON, | CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| 22  Defendants. | |

24      Lead Plaintiffs Wang Juan and Manh Dao, and named Plaintiffs Tony A
25 Tran and Abolghassem Tehrani ("Plaintiffs"), by their undersigned attorneys,
26 individually and on behalf of all other persons similarly situated, allege the
27 following based upon personal knowledge as to their own acts, and information

28

and belief as to all other matters. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   <u>NATURE OF THE ACTION</u>

1.    This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired the securities of Natural Health Trends Corp ("NHT" or the "Company"), including persons who purchased call options or sold put options, from March 6, 2015 to March 15, 2016, inclusive (the "Class Period"), and who were damaged thereby. Plaintiffs pursue remedies against Defendant NHT and certain of its officers and directors for violations of the federal securities laws.

2.    NHT is a Delaware company whose principal executive offices are located in California.

3.    NHT's business is multilevel marketing ("MLM"). MLM is a marketing strategy in which the sales force is compensated not only for sales they generate, but also for the sales of the other salespeople that they recruit. This recruited sales force is referred to as the participant's "downline", and can provide multiple levels of compensation. A prominent example of an MLM company is Amway.

4.    NHT pays commissions in two different ways. First, NHT's salespersons, which it calls Members, receive commissions on sales by their downlines at least three generations down.[1] Second, Members are paid fixed dollar rewards when their sales organizations – including infinite generations – reach

---

[1] Third generation sales are sales by Members recruited by Members recruited by Members recruited by the Member.

certain pre-specified sales targets. All commissions other than those earned by the Member's own sales are called downline commissions.

5.      NHT generates more than 90% of its sales through its Hong Kong subsidiary. NHT admits that most of its Hong Kong orders are in fact shipped to Mainland China. During the Class Period, Defendants repeatedly claimed that Mainland China was NHT's most important market.

6.      But Chinese law prohibits many aspects of MLM, including all downline commissions. In fact, it is a ***criminal*** violation of Chinese law to pay third-generation commissions.

7.      Defendants claimed that NHT did not violate Chinese law. Indeed, Defendant Sharng told investors that "[w]e have taken great care to make sure that we're not in violation of any Chinese law." Specifically, Defendants repeatedly told investors that NHT "[u]nder the NHT Global compensation plan, distributors are paid weekly commissions for product purchases by their down-line distributor network across all geographic markets, ***except China, where we maintain an e-commerce retail platform and do not pay any commissions***."[2] Indeed, Defendant Sharng added that in Mainland China "[w]e sell products ***for personal consumption*** from Hong Kong." Thus, Defendants told investors, NHT complied with the law because it did not pay downline commissions in Mainland China.

8.      Defendants' statements were not true. Plaintiffs obtained promotional materials provided by NHT to Members located in Mainland China. One of the documents, marketing slides for a presentation for Mainland China Members, touted NHT's "globally uniform" compensation practices. And both the marketing slides and a separate marketing brochure included a pyramid (the "Pyramid Drawing") demonstrating that NHT paid downline commissions in China:

---

[2] All bold and italicized emphases are added.

9.     Plaintiffs' investigator similarly spoke with nine NHT Members who reside in Mainland China, are current NHT Members, and were NHT Members during the Class Period. These Members confirmed that Chinese Members were eligible to earn downline commissions. Indeed, most Members who spoke with Plaintiffs' investigator reported that *they themselves* earned downline commissions. The Members reported that their compensation structure was the same as NHT's compensation structure in other countries.

10.     Making downline payments and advertising them were not the work of rogue Members. NHT claims in its SEC filings that it is its corporate policy to specifically approve all marketing material, including the marketing brochure and the marketing slides. NHT itself paid the Members' commissions, using proprietary software which recorded the Members' residential address. And certain NHT Members who resided in China received annual downline commissions of more than $1 million, an amount so high it could not possibly result from the

Member's own sales. Accordingly, NHT knew that it was paying downline commissions in Mainland China, and advertising the fact to current and prospective Members. Such downline payments were NHT's China strategy.

11.     By falsely assuring investors that NHT complied with China's MLM laws, Defendants concealed the substantial risk that NHT would face severe legal and regulatory penalties in China, including that NHT's China operations representing over half its global revenue would be shut down and that NHT could face substantial monetary penalties.

12.     In December 2015, Chinese authorities began to take notice of NHT's violations of MLM law. On December 28, 2015, NHT published a notice on its Chinese-language website, admitting that "*[r]ecently, there have been some member rule violations in the market*." The announcement spooked the markets, causing NHT's stock price to fall from $45.89/share to $39.78/share, or $6.04/share (13.1%).[3]

13.     On December 31, 2015, an analyst who had pretended to be interested in becoming an NHT Member reported a statement from a senior NHT official that the "vast majority" of Asian NHT Members purchased the most expensive package NHT offers, the platinum package. The platinum package's principal benefit is that it pays Members higher commissions for sales from their downlines. On December 31 and the next trading day, NHT's stock price fell from $37.05/share to $29.59/share, or $5.46 (20.1%).

14.     Then, on January 7, 2016, Chinese press reported that the Chinese State Administration for Industry and Commerce (the "SAIC") had begun an

---

[3] All stock prices are adjusted for dividends paid and shares repurchased as of April 29, 2016, the date this Complaint is filed.

investigation into NHT's MLM practices. That day, NHT's stock price fell from $28.98/share to $25.88/share, or $3.11/share (10.7%).

15.     On January 8, 2016, a screen shot of a Chinese NHT Member's internal NHT page was publicly posted. The internal page showed that the Member had a downline of 1,222 Members. That day, NHT's stock price fell from $25.88/share to $23.31/share, or $2.57/share (9.9%).

16.     On January 11, 2016, an analyst published a report documenting a site visit to NHT's Beijing offices. NHT's office was closed, but an employee in the neighboring office told the analyst's investigator that uniformed government employees had recently seized several computers from NHT's Beijing office. That day, NHT's stock price fell from $23.31/share to $20.67/share, or $2.65/share (11.3%).

17.     On January 12, 2016, NHT responded by denying certain of the analyst and media reports of an SAIC investigation,  but admitting that it was in direct contact with Beijing City government officials, giving added weight to the allegations raised by the analyst. That day, NHT's stock price fell from $20.67/share to $19.15/share, or $1.51/share (7.3%).

18.     On February 3, 2016, a Chinese newspaper published an article presenting evidence that the SAIC investigation of NHT was a large, serious MLM investigation. That day, NHT's stock price fell from $22.57/share to $21.01/share, or $1.56/share (6.9%), damaging investors.

19.     On March 15, 2016, an analyst reported that NHT's Beijing office had been shut down since March 11, 2016, showing that the shutdown resulted from the SAIC investigation. That day, NHT's stock price fell from $31.08/share to $28.45/share, or $2.63 (8.4%), damaging investors.

## II.     JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

22.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Defendants conduct business in this District, maintain their principal place of business in this District, and a significant portion of the Defendants' actions and the subsequent damages, took place within this District.

23.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

### III.     PARTIES AND IMPORTANT NON-PARTIES

24.     Lead Plaintiffs Wang Juan and Manh Dao, as set forth in their PSLRA certifications which were previously filed on the Court's docket and are incorporated by reference, acquired NHT securities at artificially inflated prices during the Class Period and were damaged thereby.

25.     Named Plaintiff Abolghassem Tehrani, as set forth in his PSLRA certifications which is attached as an exhibit to this Complaint and incorporated by reference, acquired NHT securities at artificially inflated prices during the Class Period and was damaged thereby.

26.     Named Plaintiff Tony A Tran, as set forth in his PSLRA certifications which is attached as an exhibit to this Complaint and incorporated by reference,

sold NHT put options at artificially deflated prices during the Class Period and was damaged thereby.

27.     Defendant Natural Health Trends Corp. operates as an international direct-selling and e-commerce company. NHT is a Delaware corporation headquartered in Rolling Hills Estates, California. Its common stock trades on the NASDAQ under ticker symbol "NHTC."

28.     As of December 31, 2014, NHTC had 113 full-time employees, of which only 14 were located in North America. By December 31, 2015, NHTC's full-time employee total had only risen to 133, with only 25 located in North America.

29.     Defendant Chris T. Sharng ("Sharng") has served as the Company's President since February 2007, and a director since March 2012. He served as the Company's Executive Vice President and Chief Financial Officer from August 2004 to February 2007.

30.     Defendant Timothy S. Davidson ("Davidson") has served as the Company's Chief Financial Officer ("CFO") and Senior Vice President since February 2007, and as Corporate Secretary since January 2014. He served as the Company's Chief Accounting Officer from September 2004 to February 2007.

31.     Defendant George K. Broady ("Broady") has been an NHT director since October 2008. At the beginning of the Class Period, Defendant Broady owned 30.4% of NHT's shares. Further, according to NHT's 2015 Proxy Statement, Defendant Broady is qualified to be an NHT director because he "has a deep understanding of the Company and its industry."

32.     Defendants Sharng, Davidson, and Broady are sometimes referred to herein as the "Individual Defendants."

33.     Defendant NHT and the Individual Defendants are referred to herein, collectively, as the "Defendants."

34.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(f)     approved or ratified these statements in violation of the federal securities laws.

35.     As officers, directors, and controlling persons of a publicly-held company whose securities are and were registered with the SEC pursuant to the Exchange Act, and was traded on NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

36.     NHT is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

37.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to NHT under respondeat superior and agency principles.

## A. Former employees

38.    Former Employee 1 ("FE 1") was the head of NHT's Dalian office from December 2012 to January 2014. FE 1's primary responsibility was maintaining NHT's relationships with its customer/salespersons, called Members.

39.    Former Employee 2 ("FE 2") was the sales manager in NHT's Shandong Office from December 2010 to October 2011, and remains an NHT Member (i.e., customer/salesperson), earning about RMB 100,000-200,000[4] annually.

## IV.    BACKGROUND

### A. Company background

40.    NHT sells personal care, wellness, and "quality of life" products under the "NHT Global" brand.

41.    NHT's sales model is MLM. In MLM, a company recruits salespersons, who then recruit other salespersons, and so on (the salesperson's "downline"). NHT calls its salespersons "Members". Each Member is independent of the Company and purchases product directly from the Company.

42.    Salespeople are compensated for sales made by their downlines. According to the FTC, many multi-level marketing companies are in fact pyramid schemes. Because they depend on salespersons constantly recruiting new salespersons, MLM schemes often collapse with the vast majority of participants losing money.[5] Prominent examples of successful multilevel marketing businesses include Amway Corp. and Herbalife Ltd.

---

[4] Average RMB to USD exchange rates in 2015 were 6.28:1.
[5] FTC, Multilevel Marketing, available at <
https://www.consumer.ftc.gov/articles/0065-multilevel-marketing>.

## B. NHT's compensation system

43.    NHT provides to Members a compensation plan setting out the commissions they will receive for selling NHT products (the "Compensation Plan"). The Compensation Plan stresses MLM opportunities, claiming that NHT "affords [members] the opportunity to realize [their] financial goals and dreams" including by "building a team of like minded distributors."

44.    According to the Compensation Plan, Members earn points both for their own NHT product purchases and for purchases made by their downlines. Once Members reach certain pre-established purchase levels, they automatically receive higher status. The four levels are bronze, silver, gold, and platinum. To obtain gold or platinum status, a Member or the Member's downline must buy at least $2,250 of products. To obtain platinum status, the Member must buy the $2,250 of product on his or her first order.

45.    Depending on status, Members are eligible for commissions on sales up to three generations[6] down their downline:

|                | Bronze | Silver | Platinum/Gold |
|----------------|--------|--------|---------------|
| 1st generation | 3%     | 5%     | 10%           |
| 2nd generation | 0%     | 3%     | 5%            |
| 3rd generation | 0%     | 0%     | 3%            |

46.    In addition, Members receive two-team infinity compensation. Members allocate new recruits to one of two different piles, which NHT calls the Member's right sales team and their left sales team. As the new recruits themselves recruit new Members, the Member's sales teams grow. When either the right sales

---

[6] First generation are members the initial member directly recruits. Second generation are members recruited by members the initial member recruits. Third generation are members recruited by members recruited by members the initial member recruits.

team or the left sales team has reached a designated sales level of 2,500 Bonus Volume ("BV") points, and the other has reached a sales level of 1,250 BV points, the Member receives a payment of $250 (for Gold or Platinum), $125 (for Silver), or $62.50 (for Bronze).[7]

47.     Members may also receive a one-time $125 bonus for each new member they recruit.

48.     In its SEC filings, NHT misrepresented that its compensation system did not apply in Mainland China. See ¶¶81-102 below. In particular, NHT stated that it did not pay downline commissions or engage in direct selling in Mainland China.

### C. NHT distributes commissions through a payment system that logs Members' residential addresses.

49.     NHT Hong Kong distributes commissions to Members using eWallet, a proprietary Internet-based software program similar to an electronic debit card. Each NHT Hong Kong Member, including Members residing in Mainland China, has an eWallet account. Members may purchase product using the balance they store on their eWallet account, or they may request disbursement of their balance.

50.     According to Member 1 (defined below), NHT's internal eWallet records include an entry for the Member's residential address. eWallet records also include an entry for commissions earned by the Member.

51.     Senior NHT officials have access to individual eWallet records. Accordingly, Senior NHT officials had access to information showing that their statements that NHT did not pay downline commissions in China were false.

### D. NHT primarily earns its revenues in mainland China

52.     According to its SEC filings, NHT generates the majority of its sales in Hong Kong:

---

[7] 2,500 BV is equivalent to about two platinum plan purchases.

|  | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|
| Hong Kong revenues (in thousand USD) | $26,235 | $40,585 | $111,028 | $245,737 |
| Percentage of total revenues | 69.9% | 77.3% | 89.1% | 92.8% |

53.     NHT's SEC filings admit that an outright majority of NHT's Hong Kong sales, however, are delivered to mainland China.

54.     NHT reports that as of December 31, 2015, it had 100,820 Members of its Hong Kong subsidiary. In fact, the vast majority of these Members are located in mainland China, including about 50,000 who reside in Beijing.

55.     But while MLM is legal in some circumstances in the U.S. and Hong Kong, it is not legal, under any circumstances, in Mainland China.

**E. It is unlawful to pay downline commissions in China**

56.     China took up direct selling in the late 1980's. "Direct sales" are sales made outside of a brick and mortar store. Direct sales are closely linked to MLM schemes, since MLM schemes employ direct sales.

57.     It is estimated that by 1998, there were thirty million direct salespersons in China.

58.     The direct marketing enterprises ranged vastly in legitimacy. Between 1995 and 1997, the Chinese State Administration for Industry and Commerce (the "SAIC"), an extremely powerful Chinese administrative agency which regulates all Chinese businesses, undertook two large-scale attempts to regulate, close down, and prosecute shoddy direct selling operations. However, the regulations were ineffective. Further, in the late 1990s, riots broke out in China after several pyramid schemes collapsed, with salespeople losing their savings after paying for products that were never delivered.

- 13 -

59.     As a result, in 1998, rather than attempt yet again to reform direct selling, China outlawed all direct selling, including MLM schemes.

60.     In November 2005, under pressure from the World Trade Organization, China partially eased regulations to allow direct-sales businesses.

61.     The applicable regulation during the Class Period was the State Council of the People's Republic of China's Regulation Regarding Prohibiting Multi-Level Marketing, effective November 1, 2005 (the "MLM Regulation"). A translation of the MLM Regulation is attached as Exhibit 1 to this Complaint and is incorporated by reference.

62.     The MLM Regulation defines multilevel marketing to include:

(1) An organizer or operator obtained illegal profits by recruiting members, requiring recruited members to recruit additional members and calculating and paying salaries to such recruited members based upon the number or the sales performance (including material rewards and other pecuniary rewards, same as to below) of additional members that such recruited members directly or indirectly have recruited down the stream;

(2) An organizer or operator seeks for unlawful interests by recruiting persons to participate in multi-level marketing and inciting the recruited persons to pay fees explicitly or in any disguised form like purchasing products for obtaining the qualification for participating in multi-level marketing or recruiting others to participate in multi-level marketing; or

(3) An organizer or operator seeks for unlawful interests by recruiting persons to participate in multi-level marketing, asking the recruited members to persuade others to participate in multi-level marketing so as to form a multi-level relationship, and calculating and paying the remuneration to an upper-level promoter on the basis of the sales performance of the promoters below.

MLM Regulation, Article 7

63.     Chinese courts have held that making Members buy product to qualify for the right to earn commissions qualifies as "incitement" under Article 7(2) of the

- 14 -

MLM Regulation. *Nanjing Yimi Electronic Science and Technology Corporation v. Nanjing City AIC*, Case No. (2014) Xuan Xing Chu Zi No. 54 (Oct. 26, 2014).

64.    The MLM Regulation outlaws multilevel marketing, providing for penalties of up to RMB 2,000,000, disgorgement of all unlawful proceeds, confiscation of property involved, loss of business license, and prison time for organizers, RMB 500,000, disgorgement of all unlawful proceeds, confiscation of property involved, loss of business license, and prison time for anyone who recruits or attempts to recruit other distributors, and up to RMB 2,000 for any other participant. MLM Regulation, Article 24.

65.    Chinese courts have held that using an online sales model is an aggravating factor. *Nanjing Yimi*, *supra* ¶63.

66.    The MLM Regulation also outlaws acts incidental to MLM, such as inciting unlawful gatherings to engage in MLM recruitment or operations, MLM Regulation, Article 10, or advertising for an MLM scheme. MLM Regulation, Article 9.

67.    The MLM Regulation also established an administrative framework to regulate, investigate, and prosecute MLM and direct selling. The SAIC and the PRC Public Security Bureau had primary responsibility for investigating MLM. MLM Regulation, Article 5. But the SAIC and Public Security Bureau were required to investigate any whistleblower complaints. MLM Regulation, Article 6. And if a whistleblower complaint was found to be accurate, the whistleblower is entitled to a reward. MLM Regulation, Article 6.

68.    In the course of investigating suspected MLM schemes, the SAIC may, among other things, (1) order violators to cease and desist; (2) seize products and assets; and (3) conduct inspections and searches. MLM Regulation, Article 14.

**F. It is unlawful to conduct direct sales without a license, and Chinese law imposes significant restrictions on direct selling**

69.     In 2005, the State Council of the People's Republic of China enacted the Regulations on Direct Selling Administration (the "Direct Selling Regulation"), which went into effect on December 1, 2005. A translation of the Direct Selling Regulation is attached as Exhibit 2 to this Complaint and is incorporated by reference.

70.     The Direct Selling Regulation defines direct selling as sales methods that employ direct selling salesmen to sell products to ultimate consumers outside the companies' fixed places of business. Direct Selling Regulation, Article 3.

71.     Further, the Direct Selling Regulation (a) prohibits payment of downline commissions, and (b) limits total compensation paid to salespeople to 30% of the sales total. Direct Selling Regulation, Article 24.

72.     The Direct Selling Regulation is defined as applicable to direct selling activities undertaken within the People's Republic of China. Direct Selling Regulation, Article 2.

**G. NHT's first run-in with Chinese laws against multilevel marketing**

73.     Between 2002 and 2004, NHT's sales in Hong Kong grew from 9.8% to 47.2% of total sales.

74.     Then as well as now, NHT's Hong Kong sales derived primarily from sales in mainland China.

75.     Despite its relatively small market share in China, NHT was the subject of a scathing investigative television program airing in the People's Republic of China on April 12, 2004. The TV report aired on China Central Television ("CCTV"), the Chinese central government's official TV agency, on its influential daily economics TV program, "Economy Half-Hour".

76.     The TV report followed from an extensive investigation of NHT's recruiting tactics. Among other things, the reporter attended several training sessions at which a speaker, an NHT Member, made numerous false statements,

including that NHT's products were invented by a Nobel Prize winner, that NHT was the only company in the world that sold women's cosmetic products which could prolong women's youth, and that Members could earn a BMW or $200,000 in one week. The NHT Member then urged Members to pay RMB 13,490 for Platinum Membership and immediately start recruiting others for their downline. The NHT Member referred to NHT as employing the "Pyramid Model". The CCTV program labeled NHT an "illegal MLM practice." The reporter also contacted NHT in the U.S., who then falsely denied operating in China, claiming that the Members discussed in the CCTV program must have purchased the products from Hong Kong and then illegally resold it in China. In fact, having Members purchase the products from Hong Kong and then illegally resell them in China was, and continues to be, NHT's business plan.

77.    After an internal investigation, NHT determined that additional training and development of its Hong Kong and China distributors was warranted. NHT publicly represented to investors that it would "require intensive training of its independent distributors with respect to [t]he applicable Chinese legal requirements, and [t]he need for distributors to accurately and fairly describe business opportunities available to potential distributors."

78.    Moreover, NHT supplied training by setting up a school for members in Macau. However, NHT shuttered the school in November 2005.

79.    At the time, Defendant Sharng was NHT's Executive Vice President and Chief Financial Officer.

80.    NHT also repeatedly applied for a license to engage in direct selling in China, but never received one. NHT first applied for a direct selling license in December 2005. NHT submitted a revised application in June 2006 and November 2007. NHT applied again for direct selling license in August 2015. None of NHT's applications were successful.

## V.   **DEFINDANTS' MISCONDUCT**
### A. Defendants claim that NHT Complies with Chinese law because it does not pay downline commissions in China

81.   The Class Period begins on March 6, 2015, when NHT filed its 10-K for the year ended December 31, 2014 (the "2014 10-K"). Defendants Sharng, Davidson, and Broady each signed the 2014 10-K.

82.   The 2014 10-K provided:

> Most of our Hong Kong revenue is derived from the sale of products that are delivered to members in China. After consulting with outside professionals, *we believe that our Hong Kong e-commerce business does not violate any applicable laws in China even though it is used for the internet purchase of our products by buyers in China*.

83.   The 2014 10-K acknowledged that Chinese law prohibited payments to distributors for downline sales, and also claimed that NHT did not engage in direct selling in China:

> *As a result of restrictions in China on direct selling activities, we are not conducting direct selling in China*. Consumers and members purchase the Company's products via our Hong Kong-based website or our e-commerce platform in China. The regulatory environment in China is complex. Because we operate a direct selling model outside of China, our operations in China have received regulatory and media attention. *At the end of 2005, China adopted new direct selling and anti-pyramiding regulations that are restrictive and contain various limitations, including a restriction on the ability to pay multi-level compensation to independent distributors.*

84.   But NHT's 2014 10-K claimed that it complied with Chinese law by not paying commissions for downline sales in China:

> NHT Global employs what is commonly referred to as a binary compensation plan, enhanced with certain unilevel features. Under the NHT Global compensation plan, distributors are paid weekly commissions for product purchases by their down-line distributor network across all geographic markets, *except China, where we maintain an e-commerce retail platform and do not pay any commissions*.

85.   The 2014 10-K also acknowledged that "Direct selling is prohibited in China without a direct selling license which we [NHT] do not have."

- 18 -

86.     As to sales in China, the 2014 10-K represented that "[p]urchasers of our products in China [] *may purchase only for their own personal consumption and not for resale.*"

87.     The 2014 10-K thus informed investors that (a) NHT did not pay any commissions for downline sales in China; (b) NHT did not engage in any direct selling in China; and (c) because of (a) and (b), NHT did not violate Chinese law. In fact, as set out below, NHT *did* pay commissions for downline sales in China, NHT *did* engage in direct selling in China, and for these and other reasons, NHT *did* violate Chinese law.

88.     The Sarbanes-Oxley Act of 2002 ("SOX") required the 2014 10-K to attest to whether NHT's internal controls over financial reporting were adequate. The 2014 10-K provided:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's Board of Directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
> - pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company
> - provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and
> - provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.
>
> Because of inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of

effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management evaluates the effectiveness of the Company's internal control over financial reporting by using the criteria established in Internal Control – Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on this criteria, management concluded that the Company's internal control over financial reporting as of December 31, 2014 was effective.

89.    On May 4, 2015, NHT filed its 10-Q for the quarter ending March 31, 2015 (the "Q1 2015 10-Q"). Defendant Davidson signed the Q1 2015 10-Q and Defendant Sharng and Davidson each certified, pursuant to SOX, that:

1. I have reviewed this Quarterly Report on Form 10-Q of Natural Health Trends Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]

90.    The Q1 2015 10-Q falsely asserted that:

Most of our Hong Kong revenue is derived from the sale of products that are delivered to members in China. ***After consulting with outside professionals, we believe that our Hong Kong e-commerce business does not violate any applicable laws in China even though it is used for the internet purchase of our products by buyers in China***.

[...]

Distributor commissions are typically our most significant expense and are classified as an operating expense. Under our compensation plan, distributors are paid weekly commissions, generally in their home country currency, for product purchases by their down-line distributor network across all geographic markets, ***except China, where we launched an e-commerce retail platform and do not pay any commissions.***

91.    The Q1 2015 10-Q thus informed investors that (a) NHT did not pay commissions for downline sales in China; (b) NHT did not engage in any direct selling in China; and (c) because of (a) and (b), NHT did not violate Chinese law.

In fact, as set out below, NHT *did* pay commissions for downline sales in China, NHT *did* engage in direct selling in China, and for these and other reasons, NHT *did* violate Chinese law.

92.    On May 5, 2015, NHT held a conference call to discuss its Q1 2015 results (the "Q1 2015 Earnings Call"). On the Q1 2015 Earnings Call, Defendant Sharng denied that NHT engaged in any direct selling in China:

> We currently do not engage in direct selling in China. We sell products *for personal consumption* from Hong Kong.

93.    Defendant Sharng added that *"[w]e have taken great care to make sure that we're not in violation of any Chinese law.*" Defendant Sharng's statements were false and misleading because NHT violated Chinese law by engaging in direct selling and by paying commissions for downline sales.

94.    On July 28, 2015, NHT filed its 10-Q for the quarter ending June 30, 2015 (the "Q2 2015 10-Q"). Defendant Davidson signed the Q2 2015 10-Q and Defendant Sharng and Davidson each certified, pursuant to SOX, that:

> 1. I have reviewed this Quarterly Report on Form 10-Q of Natural Health Trends Corp.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]

95.    The Q2 2015 10-Q falsely asserted that:

> Most of our Hong Kong revenue is derived from the sale of products that are delivered to members in China. *After consulting with outside professionals, we believe that our Hong Kong e-commerce business does not violate any applicable laws in China even though it is used for the internet purchase of our products by buyers in China*.
>
> [...]
>
> Distributor commissions are typically our most significant expense and are classified as an operating expense. Under our compensation plan,

distributors are paid weekly commissions, generally in their home country currency, for product purchases by their down-line distributor network across all geographic markets, *except China, where we launched an e-commerce retail platform and do not pay any commissions.*

96.     The Q2 2015 10-Q thus informed investors that (a) NHT did not pay any commissions for downline sales in China; (b) NHT did not engage in any direct selling in China; and (c) because of (a) and (b), NHT did not violate Chinese law. In fact, as set out below, NHT *did* pay commissions for downline sales in China, NHT *did* engage in direct selling in China, and for this and other reasons, NHT *did* violate Chinese law.

97.     On July 29, 2015, NHT held a conference call to discuss its Q2 2015 results (the "Q2 Earnings Call"). On the Q2 2015 Earnings Call, Defendant Sharng denied that NHT engaged in any direct selling in China:

> **<Analyst>**: Okay, yeah, I understand, because China market has importance, *right now you just sell through website, right, through online*. I know you have another local, you call that, a demo center and to show customers, and to show potential, *that you cannot do direct selling yet, it is still online only, right? Is that right?*
> **<Defendant Sharng>**: *Yes*[].

98.     Defendant Sharng expanded on that falsity, stating that if Chinese authorities approved NHT's application for a direct selling license, NHT's current sales methods would not violate the law prohibiting multilevel marketing in China.

> **<Analyst>**: Does this change our model anyway of how we're going to, I guess, either sign-up the distributors or the commissions that we pay?
> **<A - Defendant Sharng>**: It will not change our model outside of China, but within China there will be a different business model and in China we will sell a different line of products, in the beginning only cosmetics and home appliance hopefully, *and then we will pay a single level commission no more than 30% directly related to the self effort made by the individuals*. We probably will incur a higher percentage of overhead compared to the revenue because we are required to have service stations and branch offices everywhere we operate. *So the P&L will look different, but I'm hoping that there will be incremental benefit to our current financial statements.*

99.     Defendants Sharng's statement was misleading for omitting to disclose that NHT's business model in China currently depended on paying commissions for downline sales. Thus, NHT incurred severe risks in switching to a lawful model which did not pay commissions for downline sales, including that some or most of its Members would abandon NHT.

100.    On October 27, 2015, NHT filed its 10-Q for the quarter ending September 30, 2015 (the "Q3 2015 10-Q"). Defendant Davidson signed the Q3 2015 10-Q and Defendant Sharng and Davidson each certified, pursuant to SOX, that:

1. I have reviewed this Quarterly Report on Form 10-Q of Natural Health Trends Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]

101.    The Q3 2015 10-Q falsely asserted that:
Most of our Hong Kong revenue is derived from the sale of products that are delivered to members in China. ***After consulting with outside professionals, we believe that our Hong Kong e-commerce business does not violate any applicable laws in China even though it is used for the internet purchase of our products by buyers in China***.

[...]
Distributor commissions are typically our most significant expense and are classified as an operating expense. Under our compensation plan, distributors are paid weekly commissions, generally in their home country currency, for product purchases by their down-line distributor network across all geographic markets, ***except China, where we launched an e-commerce retail platform and do not pay any commissions.***

102.    The Q3 2015 10-Q thus informed investors that (a) NHT did not pay any commissions for downline sales in China; (b) NHT did not engage in any direct selling in China; and (c) because of (a) and (b), NHT did not violate Chinese

law. In fact, as set out below, NHT *did* pay commissions for downline sales in China, NHT *did* engage in direct selling in China, and for these reasons, NHT *did* violate Chinese law.

**B. NHT pays commissions for downline sales in China**

103.   NHT's claim that it did not pay commissions for downline sales in China was false.

104.   Plaintiffs obtained marketing materials provided to NHT Members in China. These marketing materials show that NHT offered downline commissions in China. For example, an introductory brochure provided to Members in Mainland China (the "Introductory Brochure") claimed that Members received commissions for downline sales, and included the Pyramid Chart, which boasted to Members that they are eligible for commissions from downline sales. *See* ¶8, above.

105.   Notably, the Pyramid Chart provides that Members would receive 10% commissions on sales made by their first generation, 5% commissions on sales made by their second generation, and 3% commissions on sales made by their third generation – exactly as set out in the Compensation Plan.

106.   Indeed, NHT's marketing materials readily admit that one principal draw of membership is the ability to receive commissions from downline sales. For example, a set of powerpoint slides presented to new members in Mainland China titled NHT Global is Built for Life-Long Commitment (the "Marketing Slides") also included the Pyramid Chart. Marketing Slides, p. 15.

107.   The Marketing Slides also admit that "on promotion incentive, we use *globally uniform* dual-track promotion reward [] system". The Marketing Slides distributed to Members in Mainland China similarly claimed that Members could receive up to $250 if their right zones and left zones obtained 3,750 BV points, consisting of 2,500 BV from one of the zones and 1,250 from the other. Marketing Slides, at 13.

108.   The Marketing Slides also include a screenshot of a Member's page showing the Member receiving commissions from first, second, and third generation downline sales. Marketing Slides, at 12.

109.   Accordingly, NHT unlawfully applied its compensation plan in Mainland China.

110.   Numerous NHT Members located in China contacted by Plaintiffs' investigator reported that NHT regularly paid them and other China-based NHT Members commissions for sales made by their downlines. Indeed, to take advantage of the higher commissions on downlines, Members who spoke with Plaintiffs' investigator almost uniformly purchased a Platinum Membership. Similarly, on December 31, 2015, an analyst posting on Value Investors Club (the "VIC Analyst"), reporting on conversations the analyst had had with NHTC's international recruiter, reported that the recruiter had told him that the "vast majority" of NHTC's Asian Members joined as Platinum Members. Since most Asian NHT Members reside in Mainland China, it follows that most Chinese Members obtain Platinum Membership. And indeed, the Marketing Slides and the Introductory Brochure do not even bother to set out the commission structure for Bronze and Silver Members –showing that the vast majority of Chinese Members obtain Platinum Memberships.

111.   Members reported that NHT assigned ranks to its Members based on their downlines, with the highest rank being 9. The Members were corroborated by a January 12, 2016 21st Century Business Herald article, which reported on internal NHT documents, purportedly likewise claiming that NHT assigned internal ranks to its Members of 1 to 9.

112.   NHT has very few rank 9 Members, with the 21st Century Business Herald article reporting that there were about a dozen. Several Members reported

that many of these few rank 9 Members were based in mainland China, highlighting one Member located in Beijing.

113.  Several Members reported that rank 9 Members could make more than $1 million per year, and that they developed tens of thousands of Members in their downlines. The January 12 21st Century Business Herald corroborates the Members' account, reporting that on average, rank 9 Members have developed downlines of 20,000 Members, and earned on average RMB 960,000 per month.

114.  NHT reported that it had 100,820 Members in Hong Kong as of December 31, 2015. In fact, NHT Members reported that the vast majority of these Members were actually located in mainland China. For example, according to Member 9, 50,000 of these 100,820 Members were located in Beijing alone. Member 2 reports that as of April 2016, there may be as many as 120,000 Members who reside in Mainland China.

115.  Further, several Members reported to Plaintiffs' investigator that the only way to become an NHT Member is to be sponsored by an existing Member – ensuring that existing Members would have a ready supply of potential new Members. Indeed, Members could *only* purchase product from their sponsor's stores.

116.  Members reported that NHT's Compensation Plan applied equally in China. For example, Members reported that Members would receive 10% commissions on sales made by their first generation, 5% commissions on sales made by their second generation, and 3% commissions on sales made by their third generation – exactly as set out in the Compensation Plan and the Pyramid Chart. Similarly, Members reported that if their right zones and left zones obtained 3,750 BV points, consisting of 2,500 BV from one of the zones and 1,250 from the other, the Member would receive a payment, denominated in US dollars. Members reported that memberships cost roughly the same in China as they did elsewhere:

in China, a Gold/Platinum membership requires a Member to purchase RMB 17,000 of product, or about $2,600.

117.   Members reported conduct which violated Chinese law in other ways. For example, Members reported that NHT and NHT Members held training sessions in Mainland China. Further, Members (other than Platinum Members) were required to pay annual fees of HK$390 or make annual purchases of HK$3,000 to maintain their Membership.

*i. Individual Member reports*

118.   Member 1, a China-based NHT Member since January 2005, reports that she works part-time to develop her downlines and make sales. She reports that she earns about RMB 7,000-8,000 per month. Member 1 is a Platinum Member. Member 1 reports that she personally receives commissions from her First, Second, and Third Generation downlines.

119.   Member 2 has been a Member of NHT in Shenzhen, China, since October 2015. Member 2 is a Platinum Member. Member 2 reports that Rank 9 Members typically develop in the range of 10,000 downlines. Member 2 never attended any training. Member 2 reports that NHT holds official training sessions for its new recruits in Guangzhou City in Mainland China.

120.   Member 3 has been a Member of NHT in Shenzhen, China, since April 2015. Member 3 considers herself a mid-level salesperson of NHT, yet has a downline of 280 Members. Member 3 earns about RMB 10,000 monthly. Member 3 is a Platinum Member.

121.   Member 3 additionally reported on NHT's "Six Networks in one" operations model. One of the six parts is that sales promotion occurs entirely through Members' recommendation, which NHT refers to as "effective and accurate promotions." In fact, NHT does not spend any money on ads or other media promotion.

122.    Member 4 has been a Member of NHT in Shenzhen since January 2014. Member 4 reports that she has a downline of thousands of Members, and that her income target is RMB 2 million this year. Member 4 reports that NHT Members separate into two distinct classes: low-level Members who purely sell NHT products, and Members who develop downlines as a career. Member 4 is a Platinum Member.

123.    Member 5 has been an NHT Member in Beijing since July 2015, after a friend convinced him to spend RMB 17,000 to buy enough NHT product for a Platinum Membership. Member 5 reports his current monthly income is RMB 10,000.

124.    Member 6 has been an NHT Member in Beijing since January 2015. Member 6 reported that she earns about RMB 2,000/month from NHT, most of it through downline commissions

125.    Member 7 has been an NHT Member in Shenzhen since June 2015, when a friend with a downline of more than 100 members talked her into joining.

126.    Member 8 has been an NHT Member in Beijing for years. Member 8 has a downline of hundreds of Members, and currently earns monthly income of RMB 50,000-100,000. Member 8 also reports that Members can only purchase product from their sponsor's stores.

127.    Member 9 has been an NHT Member located in Mainland China since October 2014. According to Member 9, NHT Mainland China Members can receive downline commissions up to three levels down. Member 9 provided the Introductory Brochure to Plaintiffs' investigator.

128.    FE 1 reports that NHT's Mainland China subsidiaries' responsibilities include new Member training.

**C. NHT engages in direct selling in China.**

129.   NHT's activities in China amount to "direct sales". Members reported that though NHT did not have a direct selling license, it only sold products in China through direct selling. NHT did not conduct any advertising in China, instead relying on promotion by Members. Indeed, NHT's Mainland China storefronts are not used to sell products, but rather to introduce and support Members and potential Members. Thus, NHT's sales in China only occurred outside NHT's fixed place of business.

130.   Member 8 reports that while NHT has established storefronts in Shenzhen, Guangzhou, Zhongshan, Shanghai, Beijing, Dalian, and other Chinese cities, the storefronts' sole purpose is to assist NHT Members and potential Members, and it is impossible for customers to purchase NHT products there.

131.   Even former NHT employees ridicule its claim not to have engaged in any direct sales in China. FE 1 reports that NHT carries out direct selling in China. FE 1 points out that all of NHT's activities are direct selling – such as membership development, compensation rewards, and even training Members. FE 1 reports that NHT's claim to carry out e-commerce in China is false. FE 1 reports that SAIC officials had simply turned a blind eye to NHT's violation of the law. FE 1 refused to reveal whether he or NHT bribed Chinese officials to have them turn a blind eye to NHT's legal violations.

132.   FE 2 also reports that NHT carries out direct selling in China. According to FE 2, NHT's claim that its sales model in China  is to sell its products through e-commerce websites is false. Rather, NHT's sales model in China is direct selling through its Members.

133.   NHT's member recruitment material readily admits that it conducts direct sales in mainland China. For example, the Marketing Slides admit that NHT's model is a "direct selling virtual model." Marketing Slides, at 4.

**D. NHT employs a Hong Kong workaround to evade Chinese law**

134.   To evade unambiguous Chinese law, NHT has employed a Hong Kong fig leaf.

135.   NHT uses HSBC Hong Kong to process eWallet payments to Chinese Members. NHT provides two ways in which Members who reside in China can be paid. First, Members can request that HSBC Hong Kong write a check in Hong Kong dollars to the Member, which the Member can physically pick up in Hong Kong. Second, the Member can set up an account in Hong Kong. HSBC Hong Kong will then wire the money to Hong Kong.

136.   Such a workaround does nothing, because under the MLM Regulation and the Direct Selling Regulation, the geographical locus of activity is the place where Members recruit other Members, sell products, or hold meetings. Since all of these activities took place in Mainland China, NHT and its sales processes were subject to Chinese law.

137.   In fact, there are well-publicized Chinese cases finding that even if a company employs Hong Kong bank accounts and ships products from Hong Kong, if it conducts recruitment in Mainland China, then it is subject to the law of Mainland China. For example, in *People v. Bo et al*, Case No. (2014) Shao Zhen Fa Xing Chu Zi No. 68 (July 30, 2014), two defendants, Hong Kong businesspeople, became members of a Hong Kong MLM scheme called Digital Crown Holdings (HK) Ltd. Just as with NHT, the scheme provided that payments would be made in Hong Kong, and product would be shipped from Hong Kong. However, the businesspeople recruited participants and sold products for use in mainland China. The Guangdong Province Shaoguan City Zhenjiang District People's Court found the Defendants guilty of violating China's laws because the locus of the recruitment and sales was Mainland China, even though the businessmen were Hong Kong residents participating in a Hong Kong scheme. Thus, before the beginning of the Class Period, Chinese courts had already rejected

Defendants' Hong Kong workaround. Moreover, the Digital Crown Holdings judgment was obvious to NHT because Digital Crown Holdings was a large company whose MLM scheme was discussed at length in a series of prominent articles published in the South China Morning Post.[8]

## VI.    LOSS CAUSATION

138.   Beginning in the end of 2015, a series of corrective disclosures alerted financial markets to the fact that NHT ran an illegal MLM business in China. These corrective disclosures caused NHT's stock price to fall, causing investors' losses.

139.   On December 28, 2015, before trading hours, NHT posted an unusual announcement on its Chinese-language website, providing in relevant part:

> To: Dear Members:
> ***Recently, there have been some member rule violations in the market***. We hereby reannounce that all members shall strictly abide to the rules as follows:
> 1. Members shall not directly and/or indirectly recruit members from other members' system;
> 2. Without NHTC's written confirmation, ***members shall not put NHTC's Chinese and/or English name or logo on any printed materials, audios, videos, internet and/or social medias (WeChat, WhatsApp)***.

140.  Because China is NHT's most important market, markets were alarmed at NHT's admission that Members had been violating rules, and further alarmed that NHT prohibited Members from using NHT's name or logo on any materials. Accordingly, on December 28, 2015, NHT's stock price fell from the

---

[8] Trapped to "get rich", South China Morning Post, July 11, 2012, (available at < http://www.scmp.com/article/1006456/trapped-get-rich>); Pyramid-scheme pair arrested in Guangdong, South China Morning Post August 22, 2013 (available at < http://www.scmp.com/news/hong-kong/article/1298395/pyramid-scheme-pair-arrested-guangdong>); Editorial, Sales scheme needs closer look, South China Morning Post October 31, 2013 (available at < http://www.scmp.com/comment/insight-opinion/article/1343994/hong-kong-multi-level-marketing-plan-needs-closer-look>).

previous day's close of $45.89/share to close at $39.78/share, or $6.04/share (13.1%), damaging investors.

141.  On December 31, 2015, the VIC Analyst published a negative report on NHT.[9] The VIC Analyst had gone undercover as a prospective Member to speak with NHTC's international recruiter. The VIC Analyst reported the recruiter's comment that in Asia, the "vast majority" of new Members joined as Platinum Members.

142.  On December 31, 2015, NHT's stock price fell from the previous day's close of $37.05/share to close at $33.48/share, or $3.57/share (9.7%). It continued to fall to close at $29.59/share the following trading day, or another $3.89/share (11.6%).

143.  On January 7, 2016, before trading hours, Chinese media reported that the Beijing SAIC was investigating NHT, and that the case had been referred to the Public Security Bureau, the Chinese police (the "January 7 Chinese Article").

144.  Also on January 7, 2016, during trading hours, an analyst published a blog post on the influential website *Seeking Alpha*, calling attention to and linking to the January 7 Chinese Article. The *Seeking Alpha* article ensured that markets learned of the January 7 Chinese Article because the investing community closely follows *Seeking Alpha*.

145.  On January 7, 2016, NHT's stock price fell from a previous day's close of $28.98/share to close at $25.88/share, or $3.11/share (10.7%), damaging investors.

146.  On January 8, 2016, a screen shot of a Chinese NHT Member's internal page was posted on www.xueqiu.com, a Chinese online financial message

---

[9] Available at <
https://www.valueinvestorsclub.com/idea/NATURAL_HEALTH_TRENDS_COR
P/137793>

board. The internal page, which was taken from the Member's NHT's account, showed that the Member had a downline of 1,222 Members.

147.   The posting, which is corroborated by the Member accounts cited in this Complaint, lent credence to allegations that NHT ran an illegal MLM scheme in China.

148.   On January 8, 2016, NHT's stock price fell from a previous day's close of $25.88/share to close at $23.31/share, or $2.57/share (9.9%), damaging investors.

149.   On January 11, 2016, during trading hours, analyst firm GeoInvesting, which had a short position in NHT's stock, published a report negative report on NHT (the "First GeoInvesting Report"). According to the First GeoInvesting Report, GeoInvesting had visited NHT's Beijing office on January 8, 2016, a work day, but had found the office closed. An employee in the neighboring office told GeoInvesting that a group of uniformed government officers had recently seized several computers from NHT's Beijing office.

150.   Separately, on January 11, 2016, the 21st Century Business Herald, a leading Chinese paper, announced that in response to whistleblower complaints, Chinese authorities had begun an investigation of NHT.

151.   On January 11, 2016, NHT's stock price fell from the previous day's close of $23.31/share to close at $20.67/share, or $2.65/share (11.3%), damaging investors.

152.   On January 11, 2016, after close of trading, NHT responded to the allegations that it was being investigated for violations of Chinese law. While NHT denied that it was being investigated by the Beijing SAIC, it conceded that it was in direct contact with Beijing City government officials. NHT thereby gave additional weight to the allegations that had been raised by the First GeoInvesting Report and the January 7 Chinese Article.

153.   On January 12, 2016, NHT's stock price fell from the previous day's close of $20.67/share to close at $19.15/share, or $1.51/share (7.3%), damaging investors.

154.   On January 13, 2016, GeoInvesting issued a report revealing that NHT's Guangzhou's headquarters had been raided by the SAIC (the "Second GeoInvesting Report"). The Second GeoInvesting Report included footage of several uniformed officers, along with persons in business attire, in NHT's offices.

155.   On January 13, 2016, before trading, NHT issued a press release denying allegations that it had been investigated by the SAIC, stating in relevant part:

> LOS ANGELES – January 13, 2016 – Natural Health Trends Corp. (NASDAQ: NHTC), a leading direct-selling and e-commerce company that markets premium quality personal care, wellness and "quality of life" products under the NHT Global brand, announced today it strongly refutes false allegations made against it by U.S. and Chinese parties that appear to be working in concert with the goals of improperly influencing the market for the Company's stock and damaging the Company's reputation, brand value and business in China.
>
> As referenced in a press release issued by Natural Health Trends on January 11, 2016, the Company became aware of an online posting alleging a government investigation of its business in China. On January 12, 2016 [sic], the Company was the focus of an additional online posting declaring its offices in Beijing had been "raided" and were under investigation. Natural Health Trends is prepared to aggressively defend itself and its business practices from these misleading, speculative allegations.
>
> The Company believes that some Chinese accusers, working in tandem with parties making online posts, have been aggressively pressing the Beijing City government to conduct an investigation of Natural Health Trends. ***The Company's staff attorney and branch manager participated in a meeting with the Beijing Chaoyang District SAIC and the Public Security Bureau at Natural Health Trends' Beijing office on January 11, 2016.*** Two accusers were present, though they declined to exchange business cards with the Company's employees. ***The outcome of this meeting, which has been***

*grossly mischaracterized in an online posting as a government "raid," was that the government authorities advised the Company and the accusers that there was insufficient evidence to warrant an investigation of Natural Health Trends. No office computers or other Company property has been removed from Natural Health Trends' offices by Chinese governmental authorities. In a separate event, on January 13, 2016, several public security officials of various districts in the Guangzhou city visited the Company's Guangzhou office as part of a routine examination. This is the office that is currently applying for a direct selling license.*

156. In light of NHT's claim that the SAIC had decided not to investigate, on January 13, 2016, NHT's stock price increased from the previous day's close of $19.18/share to close at $21.38/share, or 11.5% higher.

157. A 21st Century Business Herald reporter had been present for the January 11 Beijing raid. In an article appearing overnight between February 2 and February 3, 2016, the 21st Century Business Herald, published an article which revealed that NHT's claims in its January 13, 2016 press release were false. As to the Beijing raid, first, the reporter never saw any NHT staff attorney, and second, at the meeting, the SAIC told reporters that it needed more time to collect evidence in connection with the whistleblowers' claims (i.e., that it was investigating and would continue to investigate NHT's China operations). As to the Guangzhou raid, the reporter contacted the SAIC, who told them that for a routine matter, only 2 SAIC officials will visit, and they will not be accompanied by uniformed police officers. The SAIC will work with police officers in large, serious cases. Indeed, supporting the reporter's account, the MLM Regulation provides that "[w]hen the [SAIC] investigates and handles any suspected Multilevel marketing, there shall not be less than 2 law enforcers." MLM Regulation, Article 15.

158. But GeoInvesting's footage of the Guangzhou raid showed 6 or 7 officials, including several uniformed police officers. Thus, the Guangzhou raid was not a routine matter; rather, it was part of a large, serious case. Also on

February 3, 2016, GeoInvesting published a report calling attention to, and linking, the February 2-3 21st Century Business Herald article (the "Third GeoInvesting Article").

159.   On February 3, 2016, NHT's stock price fell from the previous day's close of $22.57/share to close at $21.01/share, or $1.56/share (6.9%), damaging investors.

160.   On March 15, 2016, during trading hours, GeoInvesting reported that NHT's Beijing office had been shut down since March 11, 2016, purportedly for renovations (the "Fourth GeoInvesting Report"). The Fourth GeoInvesting Report charged that in truth, NHT's Beijing office had been shut down as a result of the SAIC investigation.

161.   On March 15, 2016, NHT's stock price fell from the previous day's close of $31.08/share to close at $28.45/share, or $2.63 (8.4%), damaging investors.

162.   On April 14, 2016, Plaintiffs' investigator returned to NHT's Beijing office. NHT's Beijing office was still shut down, still purportedly for renovations. Notably, Beijing is NHT's most important Mainland Chinese market, with about 50,000 Members.

## VII.   ADDITIONAL FACTS PROBATIVE OF SCIENTER
### A. NHT's Chinese business is its top priority.

163.   Defendants have repeatedly described the Chinese market as NHT's most important:

(a) "China continues to be the primary focus of our resources." Defendant Sharng, Q1 2015 Earnings Call.

(b) "China is our most important and long-term development project. We are in China for the long haul." Defendant Sharng, Q1 2015 Earnings Call.

(c) "China is our most important business development project and the primary focus of our resources." Defendant Sharng, Q2 2015 Earnings Call.

(d) "We understand, I think, the social environment in China and the Chinese market pretty well, and we have existing distribution." Defendant Sharng, Q2 2015 Earnings Call.

164. Indeed, Defendant Sharng admitted in the Q2 2015 Earnings Call that "personally I travel a great deal in China."

165. And NHT regularly holds events attended by numerous Members. For example, in August 2015, NHT held its 2015 Annual Success Forum in Hong Kong, attended by 7,200 participants. Keynote speakers included Rank 9 Members based in China.

166. NHT's commissions to Members were its single largest expense, accounting for 47.8%, 45.7%, and 45.8% of NHT's net sales for the years ended December 31 2015, 2014, and 2013, respectively. NHT did not disclose that it paid commissions to Chinese Members.

**B. NHT approves all promotional items.**

167. According to the 2014 10-K, NHT requires pre-approval of all promotional products:

***We require that we produce or pre-approve all sales aids used by distributors such as videotapes, audiotapes, brochures and promotional clothing***. Further, distributors may not use any form of media advertising to promote products unless it is pre-approved by us. Products may be promoted only by personal contact or by literature produced or approved by us. ***Distributors are not entitled to use our trademarks or other intellectual property without our prior consent***.

168. Both the Marketing Brochure and the Marketing Slides were used as sales aids by Members. Further, both the Marketing Brochure and the Marketing Slides prominently displayed NHT Global's name, logo, and slogan.

169.   Accordingly, NHT Global itself approved both the Marketing Slides and the Marketing Brochure.

### C. NHT violated Chinese criminal law.

170.   Article 224-1 of the China Criminal Law, Crime of Organizing and Leading MLM, provides:

> The person who has organized or led a multi level marketing activity that, in the name of conducting business such as marketing products or providing services etc, requires participants to obtain membership by paying fees or purchasing products or services, forms multiple levels pursuant to a certain order, directly or indirectly use the number of recruited members as the basis for paying salaries or commissions, coerces or forces participants to further recruit others, deceives monetary funds or properties, and disturbs the economic and social order, shall be sentenced to no more than five years term imprisonment or criminal detention, in conjunction with pecuniary penalties; or no less than five years term imprisonment in conjunction with pecuniary penalties for severe circumstances.

171.   According to a Chinese Supreme Court interpretation, the only elements of the crime of organizing and leading an MLM are: (a) a violation of article 7 of the MLM Regulation, which (2) has no fewer than 30 members and consists of at least three generations.[10] The Supreme People's Court of the PRC, The Supreme People's Procuratorate of the PRC & the Ministry of Public Security's Opinions on Several Issues of Application of Law on Taking the Criminal Cases of Organizing and Leading MLM Activities, Gong Tong Zi [2013] No. 37.

172.   Since NHT's MLM scheme has three levels, not only does NHT violate the MLM Regulation, it also violates Chinese criminal law.

173.   Penalties for violations of Article 224-1 include a prison sentence of less than 5 years and pecuniary penalties; or, in serious circumstances, of imprisonment for more than 5 years and pecuniary penalties.

---

[10] Opinions of the Chinese Supreme Court are binding on all Chinese courts.

## VIII.   **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

174.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased NHT's securities between March 6, 2015, and March 15, 2016, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

175.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NHT's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of NHT shares were traded publicly during the Class Period on the NASDAQ. At the end of the Class Period, NHT had 11,631,415 common shares. Record owners and other members of the Class may be identified from records maintained by NHT or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

176.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

177.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

178.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(e) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(f) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of NHT;

(g) whether the Individual Defendants caused NHT to issue false and misleading financial statements during the Class Period;

(h) whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(i) whether the prices of NHT's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(j) to what extent the members of the Class have sustained damages and the proper measure of damages.

179.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

180.   The market for NHT's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, NHT's securities traded at artificially

- 40 -

inflated prices during the Class Period. On November 9, 2015, the Company's common shares closed at a Class Period high of $51.46 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of NHT's securities and market information relating to NHT, and have been damaged thereby.

181.   During the Class Period, the artificial inflation of NHT's securities was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about NHT's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of NHT and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company securities. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

182.   At all relevant times, the market for NHT's securities was an efficient market for the following reasons, among others:

(a) NHT's common shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) as a regulated issuer, NHT filed periodic public reports with the SEC and/or the NASDAQ;

(c) NHT regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and

through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) NHT was followed by at least 15 securities analysts employed by brokerage firms or professional analyst/trading firms who wrote reports about the Company during the Class Period, and many of these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

(e) During the Class Period, an average of 2,297,000 shares of NHT, or at least 18.4% of the total number of outstanding NHT common shares, permitting a very strong presumption that its shares traded on an efficient market;

(f) At least 75 market makers made a market in NHT's common stock; and

(g) New company-specific information was rapidly reflected in NHT's stock price.

183.   As a result of the foregoing, the market for NHT's securities promptly digested current information regarding NHT from all publicly available sources and reflected such information in NHT's stock price. Under these circumstances, all purchasers of NHT's securities during the Class Period suffered similar injury through their purchase of NHT's securities at artificially inflated prices and a presumption of reliance applies.

184.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a

prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.   COUNT I
### Violations of Section 10(b) of The Exchange Act and Rule 10b-5
### Against Sharng, Davidson, and NHT

185.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

186.   This Count is asserted against Defendants Sharng, Davidson, and NHT (the "10b-5 Defendants") and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

187.   During the Class Period, the 10b-5 Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of NHT securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire NHT securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, 10b-5 Defendants, and each of them, took the actions set forth herein.

188.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the 10b-5 Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for NHT securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about NHT's disclosure controls and procedures and operations in China.

189.   By virtue of their positions at NHT, the 10b-5 Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the 10b-5 Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the 10b-5 Defendants. Said acts and omissions of the 10b-5 Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

190.   Information showing that the 10b-5 Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the 10b-5 Defendants' knowledge and control. As the senior managers and/or directors of NHT, the Sharng and Davidson had knowledge of the details of NHT's internal affairs.

191.   Sharng and Davidson are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Sharng and Davidson were able to and did, directly or indirectly, control the

content of the statements of NHT. As officers and/or directors of a publicly-held company, Sharng and Davidson had a duty to disseminate timely, accurate, and truthful information with respect to NHT's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of NHT securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning NHT's business and financial condition which were concealed by the 10b-5 Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired NHT securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the 10b-5 Defendants, and were damaged thereby.

192.   During the Class Period, NHT securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the 10b-5 Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of NNHT securities at prices artificially inflated by the 10b-5 Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of NHT securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of NHT securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

193.   By reason of the conduct alleged herein, the 10b-5 Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

194.   As a direct and proximate result of the 10b-5 Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

195.   This action was filed within two years of discovery of the fraud and within five years of each of Plaintiffs' purchases of securities giving rise to the cause of action.

## XI.   COUNT II
### Violations of Section 20(a) of The Exchange Act
### Against The Individual Defendants

196.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

197.   During the Class Period, the Individual Defendants participated in the operation and management of NHT, and conducted and participated, directly and indirectly, in the conduct of NHT's business affairs. Because of their senior positions, they knew the adverse non-public information about NHT's operations, current financial position and future business prospects.

198.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to NHT's business practices, and to correct promptly any public statements issued by NHT which had become materially false or misleading.

199.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which NHT disseminated in the marketplace during the Class Period concerning the Company's disclosure controls and procedures and operations in China. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause NHT to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of NHT within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of NHT securities.

200.   Each of the Individual Defendants, therefore, acted as a controlling person of NHT. By reason of their senior management positions and/or being directors of NHT, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, NHT to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of NHT and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

201.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by NHT.

202.   This action was filed within two years of discovery of the fraud and within five years of each of Plaintiffs' purchases of securities giving rise to the cause of action.

203.

## XII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

1    A.    Determining that the instant action may be maintained as a class

2  action under Rule 23 of the Federal Rules of Civil Procedure, and certifying

3  Plaintiffs as the Class representatives;

4    B.    Requiring Defendants to pay damages sustained by Plaintiffs and the

5  Class by reason of the acts and transactions alleged herein;

6    C.    Awarding Plaintiffs and the other members of the Class prejudgment

7  and post-judgment interest, as well as their reasonable attorneys' fees, expert fees

8  and other costs; and

9    D.    Awarding such other and further relief as this Court may deem just

10  and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

- 48 -

1  Dated: April 29, 2016                    Respectfully submitted,

2

3                                           **THE ROSEN LAW FIRM, P.A.**

4                                           /s/ Laurence Rosen, Esq.

5                                           Laurence M. Rosen, Esq. (SBN 219683)
                                            355 South Grand Avenue, Suite 2450
6                                           Los Angeles, CA 90071
                                            Telephone: (213) 785-2610
7                                           Facsimile: (213) 226-4684
                                            Email: lrosen@rosenlegal.com
8

9                                           -and-

10

11                                          Adam C. McCall
                                            LEVI & KORSINSKY LLP
12                                          445 South Figueroa Street, 31st Floor
                                            Los Angeles, CA 90071
13                                          Tel: (213) 985-7290
                                            Fax (202) 333-2121
14

15

16                                          *Co-Lead Counsel for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28

Consolidated Class Action Complaint for Violation of the Federal Securities Laws – No. 2:16-cv-00255-TJH-AFM

**CERTIFICATE OF SERVICE**

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows:

I am the managing attorney of the Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071.   I am over the age of eighteen.

On April 29, 2016, I electronically filed the following CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on April 29, 2016.

/s/ Laurence Rosen

Laurence M. Rosen

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Natural Health Trends Corp.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Natural Health Trends Corp.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** Abolghassem
**Middle initial:**
**Last name:** Tehrani
**Address:**
**City:**
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**



Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 12/16/2015 | 200 | 45.9525 |
| Common Stock | 12/29/2015 | 50 | 40.05 |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below.

I am not able to travel or participate in activities beyond my very limited abilities due to my age.

**Certification for Abolghassem Tehrani (cont.)**

I declare under penalty of perjury, under the laws of the
United States, that the information entered is accurate:          **YES**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic
Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 01/08/2016

## PLAINTIFF'S CERTIFICATION

I, _____ Tony A Tran _____, certify that:

1.  Plaintiff has reviewed the complaint and authorized its filing.

2.  Plaintiff did not purchase the securities that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff's transactions in the securities that is the subject of the complaint during the class period specified in the complaint are as follows:

SEE ATTACHED

5.  Plaintiff has not sought to serve, or served, as a representative party on behalf of a class under this title during the 3-year period preceding the date on which this certification is signed, except

as follows_____.

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4/27/2016          _____
                                              Plaintiff Signature

REDACTED

Tony A Tran
TATran Corp

| Put Options | Close Date | Number of Contracts | Price per Contract | Total |
|---|---|---|---|---|
| Sale of Put Option Expiring 1/15/2016 Strike Price: $12.5 | 1/11/2016 | 600 | $10.00 | $6,000.00 |
| Covering Purchase | 1/12/2016 | 600 | ($88.13) | ($52,880.00) |
| | | | | |
| Sale of Put Option Expiring 1/15/2016 Strike Price: $15 | 1/11/2016 | 300 | $55.00 | $16,500.00 |
| Covering Purchase | 1/12/2016 | 300 | ($174.42) | ($52,325.00) |
| | | | | |
| Sale of Put Option Expiring 1/15/2016 Strike Price: $17.5 | 1/4/2016 | 2 | $40.00 | $80.00 |
| Sale of Put Option Expiring 1/15/2016 Strike Price: $17.5 | 1/4/2016 | 648 | $25.00 | $16,200.00 |
| Sale of Put Option Expiring 1/15/2016 Strike Price: $17.5 | 1/8/2016 | 115 | $90.00 | $10,350.00 |
| Total | | 765 | $34.81 | $26,630.00 |
| Covering Purchases | 1/8/2016 | 186 | ($95.00) | ($17,670.00) |
| | 1/8/2016 | 21 | ($90.00) | ($1,890.00) |
| | 1/8/2016 | 6 | ($110.00) | ($660.00) |
| | 1/8/2016 | 35 | ($115.00) | ($4,025.00) |
| | 1/8/2016 | 4 | ($124.50) | ($498.00) |
| | 1/8/2016 | 2 | ($117.50) | ($235.00) |
| | 1/8/2016 | 2 | ($123.00) | ($246.00) |
| | 1/8/2016 | 31 | ($124.00) | ($3,844.00) |
| | 1/8/2016 | 4 | ($125.00) | ($500.00) |
| | 1/8/2016 | 44 | ($155.00) | ($6,820.00) |
| | 1/12/2016 | 6 | ($240.00) | ($1,440.00) |
| | 1/12/2016 | 1 | ($255.00) | ($255.00) |
| | 1/12/2016 | 1 | ($285.00) | ($285.00) |
| | 1/12/2016 | 122 | ($290.00) | ($35,380.00) |
| | 1/12/2016 | 300 | ($325.16) | ($97,549.00) |
| Total | | 765 | ($223.92) | ($171,297.00) |

| Call Options | Close Date | Number of Contracts | Price per Contract | Total |
|---|---|---|---|---|
| Sale of Call Option Expiring 1/15/2016 Strike Price: $25 | 1/11/2016 | 5 | $105.00 | $525.00 |
| Sale of Call Option Expiring 1/15/2016 Strike Price: $25 | 1/11/2016 | 95 | $85.00 | $8,075.00 |
| Sale of Call Option Expiring 1/15/2016 Strike Price: $25 | 1/11/2016 | 100 | $55.00 | $5,500.00 |
| Sale of Call Option Expiring 1/15/2016 Strike Price: $25 | 1/11/2016 | 100 | $60.00 | $6,000.00 |
| Total | | 300 | $67.00 | $20,100.00 |
| Covering Purchase | 1/12/2016 | 300 | ($54.77) | ($16,431.00) |
| | | | | |
| Sale of Call Option Expiring 1/15/2016 Strike Price: $30 | 1/11/2016 | 123 | $40.00 | $4,920.00 |
| Covering Purchases | 1/12/2016 | 10 | ($20.00) | ($200.00) |
| | 1/13/2016 | 113 | ($40.00) | ($4,520.00) |
| Total | | 123 | ($38.37) | ($4,720.00) |
| | | | | |
| Sale of Call Option Expiring 1/15/2016 Strike Price: $45 | 1/5/2016 | 270 | $30.00 | $8,100.00 |
| Covering Purchase | 1/12/2016 | 270 | ($5.00) | ($1,350.00) |

|  |  |
|---|---|
| **Total Sales** | **$82,250.00** |
| Total Covering Purchases | ($299,003.00) |

# EXHIBIT A

**Laws of the People's Republic of China**


**REGULATION ON PROHIBITION OF MULTI LEVEL MARKETING**

The State Council

Order of the State Council of the People's Republic of China

No. 444
The Regulation on Prohibition of Multi Level Marketing, which was adopted at the 101st executive meeting of the State Council on August 10, 2005, are hereby promulgated and shall go into effect as of November 1, 2005.

Premier of the State Council, Wen Jiabao

August 23, 2005

Regulation on Prohibition of Multi-Level Marketing

Chapter I General Provisions

Article 1
With a view to preventing frauds, protecting the legitimate rights and interests of citizens, legal persons and other organizations, maintaining the socialist market economic order and preserving social stability, this Regulation is formulated.

Article 2

Article 2  The Multi Level marketing in this Regulation refers to an activity of an organizer or operator to obtain illegal profits, disrupt the economic order and disturb the social stability by recruiting members and calculating and paying salaries to such recruited members based upon the number or the sales performance of additional members that such recruited members directly or indirectly have recruited, or requiring a recruited member to pay a certain amount of fees as a condition to become a member.

Article 3

The local people's government at or above the county level shall strengthen the leadership in investigating and handling the Multi-Level Marketing, support and urge all relevant departments to perform their administrative and supervisory duties according to law.

The local people's government at or above the county level shall, in light of actual needs, establish a coordinative mechanism for the investigation and handling of Multi-Level Marketing, and

1

timely coordinate and solve those significant problems occurred in the work relating to the investigation and handling of Multi-Level Marketing.

Article 4

The administrations of industry and commerce and the public security agencies shall, pursuant to this Regulation, investigate and handle the Multi-Level Marketing selling within their respective scope of duties.

Article 5

When investigating and handling the Multi-Level Marketing, the administrations of industry and commerce and the public security agencies shall adhere to the principle of combining education with punishment, and shall instruct citizens, legal persons or other organizations to voluntarily abide by the law.

Article 6

All entities and individuals are entitled to report any Multi-Level Marketing to the department of industry and commerce administration or the public security organ, which shall, after receiving such a report, promptly carry out investigation and verification, conduct enforcement  in accordance with the law and keep the whistleblower confidential.  Where the report is found to be true upon investigation, the whistleblower shall be rewarded pursuant to the relevant state provisions.

Chapter II Types of Multi-Level Marketing and the Investigation and Enforcement Authority

Article 7

The following acts constitute Multi-Level Marketing
(1)

An organizer or operator seeks for unlawful interests by recruiting persons to participate in Multi-Level Marketing, asking recruited members to recruit others , calculating and paying remunerations (including material awards and other economic interests, the same below) to a recruited member on the basis of the number of persons such recruited member has directly or indirectly recruited in a rolling way;
(2)

An organizer or operator seeks for unlawful interests by recruiting persons to participate in Multi-Level Marketing and asking recruited members to pay fees explicitly or in any disguised form like purchasing products for obtaining the qualification for participating in Multi-Level Marketing or recruiting others to participate in Multi-Level Marketing; and

(3)

An organizer or operator seeks for unlawful interests by recruiting persons to participate in Multi-Level Marketing, asking recruited member to persuade others to participate in Multi-Level Marketing so as to form a multi-level relationship, and calculating and paying the remuneration to an upper-level promoter on the basis of the sales performance of the promoter's downstream members.

Article 8

The department of industry and commerce administration shall, under this Regulation, be responsible for investigating and handling the Multi-Level Marketing as prescribed in Article 7 of this Regulation.

Article 9

The release of Multi-Level Marketing information as set out in Article 7 of this Regulation via the internet or any other public media shall be investigated and handled by the department of industry and commerce administration jointly with the telecommunication department in accordance with this Regulation.

Article 10

Where any organizer or operator deceives others into leaving their homes for unlawful gathering and restricts their liberties in the name of introducing jobs or engaging in business operations in Multi-Level Marketing, the public security organ shall make investigations and handle it in conjunction with the department of industry and commerce administration.

Article 11

The administrative departments or entities of commerce, education, civil affairs, public finance, labor security, telecommunication and taxation shall, in pursuance of their respective duties and the relevant laws and administrative regulations, cooperate with the department of industry and commerce administration and the public security organ in investigating and handling the Multi-Level Marketing cases.

Article 12

Such grassroots organizations as the rural villagers' committee or the urban residents' committee shall cooperate with the relevant administrative department in investigating and handling Multi-Level Marketing cases under the guidance of the local people's government.

Article 13

The department of industry and commerce administration shall investigate and handle any Multi-Level Marketing, and shall, if it may constitute a crime, transfer it to the public security organ for

placing the case on file for investigation. The public security organ shall place the case on file for investigation and shall, if the Multi-Level Marketing does not constitute a crime upon investigation, transfer it to the department of industry and commerce administration for investigation and handling.

Chapter III Measures and Procedures of Investigation and Handling

Article 14
The department of industry and commerce administration at or above the county level may, when investigating and handling the suspected Multi-Level Marketing, take the following measures:

(1)

Ordering the violator to cease pertinent activities;

(2)

Making investigations against the organizer, operator or individual suspected of being involved in Multi-Level Marketing and making inquiries;

(3)

Carrying out on-the-spot inspections by entering into the business, training gathering places suspected of being involved in Multi-Level Marketing;

(4)

Consulting, copying, sealing up or seizing the relevant contracts, bills, account books or other materials suspected of being involved in Multi-Level Marketing;

(5)

Sealing up or seizing the products (commodities),tools, equipment, raw materials and properties that are suspected of being involved in Multi-Level Marketing;

(6)

sealing up business places suspected of being involved in Multi-Level Marketing;
(7)

Consulting accounts, accounting vouchers, account books and statements of account regarding the deposits of the organizer or operator suspected of being involved in Multi-Level Marketing; and

(8)

Applying to the judicial organ for freezing the unlawful funds if there is evidence showing that

they are to be transferred or concealed.

In case the department of industry and commerce administration adopts any of the measures as prescribed in the preceding paragraph, it shall report it, in speech or writing, to the principal leader of the department of industry and commerce administration at or above the county level for approval. Where it is necessary to adopt any of the measures as prescribed in the preceding paragraph under emergency conditions, the department of industry and commerce administration shall report it promptly and make up the relevant formalities afterwards. In particular, the implementation of seal-up or seizure or any measure as prescribed in Item (7) or (8) shall be subject to obtaining a written approval of the principal leader of the department of industry and commerce administration at or above the county level in advance.

Article 15

When the department of industry and commerce administration investigates and handles any suspected Multi-Level Marketing, there shall not be less than 2 law enforcers.

Any law enforcer that has a direct interest with the party involved shall withdraw.

Article 16

When investigating and handling a suspected Multi-Level Marketing, the law enforcer of the department of industry and commerce administration shall produce his identity documents to the parties involved or the relevant persons.

Article 17

When the department of industry and commerce administration seals up or seizes properties and materials, it shall deliver to the parties involved on the spot a written decision on the seal-up or seizure and a list of properties and materials to be sealed up or seized.

Where it is in an inconvenient area or the investigation and handling of the case will be affected if the seal-up or seizure is not timely carried out, the seal-up or seizure may be carried out in advance and the decision on seal-up or seizure shall be made up within 24 hours and be delivered to the parties involved.

Article 18

The period for the department of industry and commerce administration to carry out the seal-up or seizure may not be more than 30 days as is a general rule; if the case is complicated, it may be extended for another 15 days upon the approval of the principal leader of the department of industry and commerce administration at or above the county level.

The department of industry and commerce administration shall properly keep properties that are sealed up or seized, and may not use or destroy them. It shall be liable for any loss incurred unless the loss is caused by force majeure.

Article 19

When the department of industry and commerce administration carries out a seal-up or seizure, it shall ascertain the facts in a timely manner, and make a handling decision during the period of seal-up or seizure.

Where the Multi-Level Marketing case is verified upon investigation, the illegal properties that are sealed up or seized shall be confiscated in accordance with the law. Where, upon investigation and verification, there is no Multi-Level Marketing activity or the seal-up or seizure is no longer required, the seal-up shall be canceled and the seized properties shall be promptly returned in a prompt manner upon the handling decision.

If the department of industry and commerce administration fails to make a handling decision within the prescribed time limit, the properties sealed up shall be regarded as having been unsealed and the seized properties shall be returned. If the department of industry and commerce administration refuses to return them, the party involved may file an administrative litigation in the people's court.

Article 20

If the department of industry and commerce administration or any of its functionaries violates this Regulation by using or destroying any of the properties sealed up or seized and causes economic losses to the parties involved, it/he shall assume the responsibility for compensation.

Article 21

When the department of industry and commerce administration investigates and handles a suspected Multi-Level Marketing case, the party involved has the right to make statements and defend himself.

Article 22

When the department of industry and commerce administration investigates and handles a suspected Multi-Level Marketing case, it shall make records on the spot.
The records made on the spot and the list of properties and materials sealed up or seized shall be signed or stamped by the parties involved, witnesses and law enforcers. In case the party involved is absent or the party involved or the witness refuses to sign or seal, the enforcers shall indicate it down in the on-the-spot records.

Article 23

As for the verified Multi-Level Marketing case, the department of industry and commerce administration and the public security organ may promulgate a warning or a notice to remind the general public.

The release of a warning or notice to the general public shall be subject to the approval of the

principal leader of the department of industry and commerce administration or the principal leader of the public security organ at or above the county level.

Chapter IV Legal Liabilities

Article 24

Where an individual commits any act as prescribed in Article 7 of this Regulation and organizes and contrives Multi-Level Marketing, the department of industry and commerce administration shall confiscate his illegal properties and gains and impose upon him a fine of 500,000 Yuan up to 2 million Yuan, and if a crime is constituted, he shall be investigated for criminal liabilities according to law.

Where an individual commits any act as prescribed in Article 7 of this Regulation and introduces, induces or coerces any other person to participate in Multi-Level Marketing, the department of industry and commerce administration shall order him to cease the illegal act, confiscate his unlawful properties and gains and impose upon him a fine of 100,000 Yuan up to 500,000 Yuan; and if a crime is constituted, he shall be investigated for criminal liabilities according to law.

Where an individual commits any act as prescribed in Article 7 of this Regulation and participates in Multi-Level Marketing, the department of industry and commerce administration shall order him to cease the illegal act and impose upon him a fine of less than 2,000 Yuan.

Article 25

When the department of industry and commerce administration imposes punishments under Article 24 of this Regulation, it can order the violator to suspend operations for rectification or revoke its/his business license in accordance with the relevant laws and administrative regulations.

Article 26

Where an entity or individual provides such conditions as business or training places, goods, custodian or storage service and so on, for Multi-Level Marketing as prescribed in Article 7 of this Regulation, the department of industry and commerce administration shall order it/him to cease the unlawful act, confiscate its/his unlawful gains and impose upon it/him a fine of 50,000 Yuan up to 500,000 Yuan.
Where an entity or individual provides internet information services for Multi-Level Marketing as prescribed in Article 7 of this Regulation, the department of industry and commerce administration shall order it/him to cease the illegal act and inform the relevant department to mete out punishments according to the Measures for the Administration of Internet Information Services.

Article 27

Where a party involved illegally puts to use, replaces, transfers or destroys the properties sealed

1

up or seized, the department of industry and commerce administration shall order him to cease the illegal act and impose upon him a fine of 5% to 20% of the value of the properties used, replaced, transferred or destroyed. If he refuses to make corrections, a fine of one to three times the value of the properties used, replaced, transferred or destroyed shall be imposed.

Article 28

Where anyone commits any act as prescribed in Article 10 of this Regulation and refuses or impedes the enforcers of the department of industry and commerce administration to make investigations and handle the case and thus violates the regulations on public security administration, the public security organ shall impose punishments on him in pursuance of the laws and administrative regulations on public security administration; if a crime is constituted, he shall be investigated for criminal liabilities according to law.

Article 29

Where the department of industry and commerce administration, the public security organ and their functionaries abuse their power, neglect their duties or practice favoritism and fail to investigate or handle Multi-Level Marketing cases according to the duties and procedures as prescribed in this Regulation, or fail to investigate or handle the Multi-Level Marketing found, or support, harbor or connive any Multi-Level Marketing, and a crime is thus constituted, the person-in-charge and other persons directly responsible shall be investigated for criminal liabilities according to law; if no crime is constituted, the person-in-charge and other persons directly responsible shall be subject to administrative sanctions.

Chapter V Supplementary Provisions

Article 30

This Regulation shall go into effect as of November 1, 2005.

# EXHIBIT B

**Laws of the People's Republic of China**

**REGULATIONS ON DIRECT SELLING ADMINISTRATION**

The State Council

Order of the State Council of the People's Republic of China

No. 443

The Regulations on Direct Selling Administration, which were adopted at the 101st executive meeting of the State Council on August 10, 2005, are hereby promulgated, and shall go into effect as of December 1st, 2005.

Premier of the State Council Wen Jiabao

August 23rd, 2005

Regulations on Direct Selling Administration Chapter I General Provisions Article 1

With a view to regulating direct selling acts, strengthening supervision over direct selling activities, preventing fraud and protecting the legitimate rights and interests of consumers and public interests, the present Regulations are formulated.

Article 2

The present Regulations shall be subject to the direct selling activities undertaken within the territory of the People's Republic of China.

The scope of direct selling products shall be determined and promulgated by the competent department of commerce of the State Council jointly with the administrative department of industry and commerce of the State Council on the basis of the development of the direct selling industry and the demands of consumers.

Article 3

The term "direct selling" as mentioned in the present Regulations refers to a type of business mode, in which direct selling companies recruit direct selling salesmen to sell products directly to end consumers(hereinafter referred to as consumers)outside the companies' fixed places of business.

The term "direct selling companies" as mentioned in the present Regulations refers to the companies which, upon approval, sell products by way of direct selling according to the provisions of the present Regulations.

The term "direct selling salesmen" as mentioned in the present Regulations refers to any person

2

who sells products directly to consumers outside the fixed places of business.

Article 4

Any company that is established within the territory of the People's Republic of China (hereinafter referred to as the company) may, in accordance with the provisions of the present Regulations, apply for establishing a direct selling company that sells the products produced by itself or the products produced by its parent company or holding company by way of direct selling.

A direct selling company may obtain the trade right and distribution right according to law.

Article 5

When undertaking direct selling activities, no direct selling company or its direct selling salesman may conduct any fraudulent or misleading and other drumbeating and sales promotion acts.

Article 6

The competent commerce department and the administrative department of industry and commerce of the State Council shall, in line with the division of their responsibilities and the provisions of the present Regulations, be responsible for conducting supervision and administration on direct selling companies and direct selling salesmen as well as their direct selling activities.

Chapter II Establishment and Alteration of Direct Selling Companies and Their Branches Article

7

Anyone applying for establishing a direct selling company shall satisfy the following requirements:

1**.**

The investor shall have good commercial reputation, and have no records of serious illegal operation during the past five years before filing the application; in the case of a foreign investor, it shall, in addition, have undertaken direct selling business outside China for at least three years;

2**.**

The paid-in registered capital shall be no less than RMB 80 million Yuan;

3.

The deposits shall have been fully paid in the designated bank in accordance with the provisions of the present Regulation; and

4.

The system of information reporting and disclosure shall have been established as required.

Article 8

Anyone applying for establishing a direct selling company shall fill out the application form and provide the following application documents and materials:

1.

the certification documents conforming to the conditions as provided for in Article 7 of the present Regulation;

2.

articles of association of the company; in the case of establishment of a Sino-foreign joint venture or cooperative company, the contract of the joint venture or cooperative company shall be provided as well;

3.

the report on market plan, including the scheme for service networks in the area where direct selling business is conducted as recognized by the people's governments at or above the county level, which is drawn up according to the provisions of Article 10 of the present Regulations;

4.

descriptions of products up to the national standards;

5.

model sales contract to be signed with the direct selling  salesman;

6.

report on the verification of capital as issued by an accounting firm; and

7.

agreement concluded between the company and the designated bank on using the deposit according to the present Regulations.

Article 9

An applicant shall, through the competent commerce department at the province, autonomous region, and municipality directly under the Central Government at its locality, file an application with the competent commerce department of the State Council. The competent commerce department at the province, autonomous region, and municipality directly under the Central

Government shall, within 7 days as of the day of receipt of the application documents and materials, submit the application documents and materials to the competent commerce department of the State Council. The competent commerce department of the State Council shall, within 90 days as of the day of receipt of all the application documents and materials, and upon the opinions solicited from the administrative department of industry and commerce of the State Council, make a decision on whether or not to approve it. And if an approval is granted, it shall issue the direct selling license.

An applicant shall, upon the strength of the direct selling license issued by the competent commerce department of the State Council, apply for registration of alteration to the administrative department of industry and commerce according to law. The competent commerce department of the State Council shall, when carrying out examination and issuing the direct selling license, take into account such factors as national security, public interests, and the development of the direct selling sector, etc.

Article 10

When undertaking direct selling business, a direct selling company shall, in the administrative regions of the provinces, autonomous regions, and municipalities directly under the Central Government where it plans to undertake direct selling business, establish branches(hereinafter referred to as branches), which shall be responsible for the direct selling business within their regions respectively .

A direct selling company shall, within the area where it undertakes direct selling business, establish service networks which may facilitate and satisfy consumers and direct selling salesmen to know about the price of products and returning and changing of products and for the company to provide other services. The establishment of such service networks shall satisfy the requirements of the local people's governments at or above the county level.

When applying for establishment of branches, a direct selling company shall provide the certification documents and materials complying with the provisions of the preceding paragraph, and shall file an application according to the procedures as provided for in paragraph one of Article 9 of the present Regulations. After approval is granted to the application, the company shall register with the administrative department of industry and commerce according to law.

Article 11

In the case of any major alteration in the contents as listed in Article 8 of the present Regulations, a direct selling company shall, in light of the procedures as provided for in paragraph one of Article 9 of the present Regulations, report it to and seek approval from the competent commerce department of the State Council.

Article 12

The competent commerce department of the State Council shall promulgate on the government website the name list of the direct selling companies and their branches, and update it in a timely

5

manner.

Chapter III Recruiting and Training of Direct selling salesmen Article 13
A direct selling company and its branches may recruit direct selling salesmen. Any other entity or individual is not allowed to recruit any direct selling salesman.

The lawful selling activities of direct selling salesmen may not be investigated and punished on the ground of unlicensed business.

Article 14

No direct selling company or any of its branches may promulgate any advertisements drumbeating the remunerations for its direct selling salesmen, nor may it have the payment of fees or purchase of commodities as the conditions for becoming a direct selling salesman thereof.

Article 15

No direct selling company or any of its branches may recruit the following personnel as a direct selling salesman:

1.

person under the age of 18;

2.

person without capacity or with limited capacity for civil conduct;

3.

full-time school students;

4.

teachers, medical personnel, public servants and soldiers in active service;

5.

formal employees of the direct selling company;

6.

overseas personnel; and 7.

personnel as prohibited from taking part-time jobs by laws or administrative regulations.

Article 16
A direct selling company and its branches shall conclude a sales contract with any direct sellingsalesman it recruits, and shall ensure that its direct selling salesmen carry out direct selling business only in the province, autonomous region, and municipality directly under the Central Government where one of its branches has established service location. Any person who fails to conclude a sales contract with a direct selling company or any of its branches may not carry out direct selling business by any way.
Article 17

A direct sellingsalesman may, within 60 days as of the day of conclusion of the contract, rescind a sales contract at any time; after the 60 days as of the day of conclusion of the contract, it shall notify the direct selling company 15 days before rescinding the sales contract.

Article 18

A direct selling company shall be responsible for organizing the vocational training and examination of the direct selling salesmen it recruits, and shall issue the certificates of direct selling salesman to the direct selling salesmen who have passed the examination. Anyone who fails to obtain the certificate of direct selling salesman may not undertake direct selling activities.

No direct selling company may charge the direct selling salesman any fees for the vocational training and examination.

No entity or individual outside a direct selling company is allowed to organize the vocational training of direct selling salesmen in any name.

Article 19

The teaching staff who give vocational training to direct selling salesmen shall be the formal employees of the direct selling company, and shall satisfy the following requirements:

1.

Having worked in the companies for more than one year;

2.

Having received graduate or post-graduate education and having the relevant professional knowledge of law and marketing;

3.

Having no records of being punishment for deliberate crimes; and

4.

Having no records of major illegal operation.

A direct selling company shall issue the certificates of direct selling trainer to the teaching staff that satisfy the provisions of the preceding paragraph, and shall report the name list of the personnel who have obtained the certificate of direct selling trainer to the competent commerce department of the State Council for record. The said department shall promulgate on the government website the name list of the personnel who have obtained the certificate of direct

selling trainer.

No foreigner may undertake the vocational training of direct selling salesmen.

Article 20

The certificate of direct selling salesman and the certificate of direct selling trainer issued by a direct selling company shall be printed in the format as prescribed by the competent commerce department of the State Council.

Article 21

A direct selling company shall be responsible for the legitimacy of the vocational training of direct selling salesmen, the training order and the safety of the training places.

A direct selling company and its direct selling trainers shall be responsible for the legitimacy of the teaching contents of vocational training of direct selling salesmen.

The concrete measures for the administration of vocational training of direct selling salesmen shall be separately formulated by the competent commerce department of the State Council and the administrative department of industry and commerce of the State Council in conjunction with the relevant departments.

Chapter IV Direct Selling Activities

Article 22

When selling products to consumers, a direct selling salesman shall comply with the following provisions:

1.

showing the certificate of direct selling salesman and the sales contract;

2.

not entering into the abode of any consumer to sell products compulsively without the consent of the consumer, stopping promotion activities immediately and leaving the consumer's abode if the consumer requires him to do so;

3.

giving consumers detailed account of the company's system of returning goods before the bargain is struck; and

4.

providing consumers with invoices as well as the sales voucher containing such contents as the system of returning goods, the address of the local service location of the direct selling company and the telephone number, etc. issued by the direct selling company after the bargain is struck.

Article 23

A direct selling company shall clearly mark the product price on the direct selling product, and the price shall be consistent with the price of the product as showed at the service website. A direct selling salesman shall sell direct selling products to consumers at the marked price.

Article 24

A direct selling company shall pay remuneration to its direct selling salesmen at least on a monthly basis. The remunerations paid to any direct selling salesman by a direct selling company shall be calculated on the basis of the income gained from selling products directly to consumers by the direct selling salesman himself/herself, and the total remuneration (including commission, bonus, various awards and other economic benefits, and etc.) may not exceed 30% of the income gained from selling products directly to consumers by the direct selling salesman himself/herself.

Article 25

A direct selling company shall establish and put into practice the sound system of changing and returning of goods.

Any consumer may, within 30 days as of the day of purchasing any direct selling product, upon the strength of the invoice or the sales voucher issued by the direct selling company, change or return the product to the direct selling company or its branches, or the service website at his locality or the direct selling salesman who sells the product, on the condition that the product remains unopened. The direct selling company and its branches, the service website at his locality or the direct selling salesman shall, within 7 days as of the day when the consumer requests for changing or returning the product, handle the change or return of the product according to the price as made out in the invoice or the sales voucher.

A direct selling salesman shall, within 30 days as of the day of purchasing the direct selling product, upon the strength of the invoice or the sales voucher issued by the direct selling company, change or return the product to the direct selling company or its branches, or the service website at his locality, on the condition that the product remains unopened. The direct selling company and its branches, or the service website at his locality shall, within 7 days as of the day when the direct selling salesman requests for changing or returning the product, handle the changing or returning of the product according to the price as made out in the invoice or the sales voucher.

Except for the circumstances as prescribed in the two preceding paragraphs, where a consumer or direct selling salesman requests changing or returning any product, the direct selling company or

its branches or the service website at his locality and the direct selling salesman shall, according to the provisions of the relevant laws and regulations or the stipulations of the contract, change or return the product.

Article 26

If any dispute arises from changing or returning goods between any direct selling company and any of its direct selling salesman or between any direct selling company or its direct selling salesmen and any consumer, the former shall bear the burden of proof.

Article 27

A direct selling company shall bear the joint responsibility for the direct selling acts of any of its direct selling salesmen, unless it can prove that the direct selling act of the direct selling salesman has nothing to do with the company.

Article 28

A direct selling company shall, in accordance with the provisions of the competent commerce department of the State Council and the administrative department of industry and commerce of the State Council, establish and put into practice a sound information reporting and disclosure system.

The provisions on the contents and ways of the information reporting and disclosure of any direct selling company and the relevant requirements shall be separately prescribed by the competent commerce department of the State Council and the administrative department of industry and commerce of the State Council.

Chapter V Deposit

Article 29

A direct selling company shall open a special account in the bank designated by the competent commerce department of the State Council together with the administrative department of industry and commerce of the State Council, and put a deposit into it.

The deposit shall be RMB 20 million Yuan at the time when a direct selling company is established. After the direct selling company starts operation, the deposit shall be adjusted on a monthly basis, and the amount shall remain at 15% of its sales income from direct selling products of the previous month, but may not exceed RMB 0.1 billion Yuan at the maximum and not less than RMB 20 million Yuan at the minimum. The interest of the deposit shall be owned by the direct selling company.

Article 30

In the case of any of the following circumstances, the deposit may be used upon the decision

10

jointly made by the competent commerce department of the State Council and the administrative department of industry and commerce of the State Council:

1.

A direct selling company fails to pay remuneration to its direct selling salesmen without justifiable reasons, or fails to pay the money for returned goods to direct selling salesmen and consumers;

2.

A direct selling company involves itself in such circumstances as suspension of business, merger, dissolution, transfer and bankruptcy and etc., and lacks the ability to pay remuneration to its direct selling salesmen or to pay the refunds to direct selling salesmen or consumers; or

3.

A direct selling company shall make compensation for any damage to consumers due to the quality of its direct selling products under the law, but it refuses to do so without justifiable reasons or lack the ability to make compensation.

Article 31

Where any deposit is used according to the provisions of Article 30 of the present Regulations, the direct selling company shall, within one month, replenish the deposit to the level as prescribed in paragraph two of Article 29 of the present Regulations.

Article 32

No direct selling company is allowed to offer the deposit as a guarantee or use it to discharge debts in violation of the present Regulations.

Article 33

Where a direct selling company no longer undertakes any direct selling business, it may withdraw the deposit from the aforesaid bank upon the strength of the credence issued by the competent commerce department of the State Council and the administrative department of industry and commerce of the State Council.

Article 34

The competent commerce department of the State Council and the administrative department of industry and commerce of the State Council shall be jointly responsible for the routine supervision on the aforesaid deposit.

The specific measures for payment and use of the deposit shall be separately formulated by the

11

competent commerce department of the State Council and the administrative department of industry and commerce of the State Council in conjunction with the relevant departments.

Chapter VI Supervision and Administration

Article 35

The administrative department of industry and commerce shall be responsible for the routine supervision and administration on direct selling companies and direct selling salesmen and their direct selling activities. The administrative department of industry and commerce may conduct on-site inspection by taking the following measures:

1.

conducting inspection by entering into the relevant companies;

2.

requiring the relevant enterprises to provide the relevant documents, materials and certification documents;

3.

inquiring of the parties concerned, the interested parties and other relevant personnel about the relevant issues, and requiring them to provide the relevant materials;

4.

consulting, copying, seizing and detaining the relevant materials and illegal property of the relevant enterprises that are related to direct selling activities; and

5.

checking up the certificates of direct selling trainers and the certificates of direct selling salesmen and other certificates of the relevant personnel.

When the administrative department of industry and commerce carries out on-site inspection pursuant to the preceding provisions, there shall be no less than two inspectors who shall show lawful certificates. The implementation of seizure or detention shall be subject to the approval of the person-in-charge of the administrative department of industry and commerce at or above the county level.

Article 36

When conducting routine supervision and administration, in case the administrative department of industry and commerce discovers that the relevant enterprises commit any act suspected of violating the present Regulations, it may, upon the approval of the person-in-charge of the

12

administrative department of industry and commerce at or above the county level, order them to suspend their business operations.

Article 37

The administrative department of industry and commerce shall set up and publicize the informants' hot-line, and accept the report and complaints on acts that violate the present Regulations, and make investigation on and handle them in a timely manner.

The administrative department of industry and commerce shall keep secret of the informants, and shall, according to the relevant provisions of the State, grant awards to those meritorious informants.

Chapter VII Legal Liabilities Article 38

Where the relevant departments and their staff members that carry out administration and supervision on direct selling companies and direct selling salesmen and their direct selling activities, grant license to any application that fails to comply with the conditions as prescribed in the present Regulations, or do not perform the duty of supervision and administration in line with the provisions of the present Regulations, the person-in-charge who is directly responsible and other personnel held directly liable shall be given administrative sanctions according to law. If a crime is constituted, they shall be investigated for criminal liabilities according to law. The license granted to any application that does not comply with the conditions as prescribed in the present Regulations shall be revoked by the relevant department that has made the decision on granting the license.

Article 39

Where a direct selling company violates the provisions of Articles 9 and 10 of the present Regulations by undertaking direct selling activity without approval, it shall be ordered by the administrative department of industry and commerce to make corrections, and shall be subject to the confiscation of its direct selling products and illegal sales income as well as a fine of not less than 50,000 Yuan but not more than 300,000 Yuan. If the circumstances are serious, it shall be imposed upon a fine of not less than 300,000 but not more than 500,000 Yuan, and shall be banned according to law. If a crime is constituted, it shall be investigated for criminal liabilities according to law.

Article 40

Where an applicant has obtained the licenses as established in Articles 9 and 10 of the present Regulations by cheating, bribery or any other foul means, the administrative department of industry and commerce shall confiscate its direct selling products and illegal sales revenue, and impose upon the applicant a fine of not less than 50,000 Yuan but not more than 300,000Yuan. And the competent commerce department of the State Council shall revoke its corresponding licenses, and the said applicant shall be prohibited from filing an application again. If the circumstances are serious, it shall be imposed a fine of not less than 300,000 Yuan but not more than 500,000 Yuan, and shall be banned according to law. If a crime is constituted, it shall be

13

investigated for criminal liabilities according to law.

Article 41

Where a direct selling company violates the provisions of Article 11 of the present Regulations, the administrative department of industry and commerce shall order it to make corrections, and impose upon it a fine of not less than 30,000 Yuan but not more than 300,000 Yuan. Where a direct selling company no longer satisfies the conditions for licensing of direct selling, its direct selling license shall be revoked by the competent commerce department of the State Council.

Article 42

Where a direct selling company violates regulations by undertaking direct selling business beyond the scope of direct selling products, the administrative department of industry and commerce shall order it to make corrections, confiscate its direct selling products and illegal sales revenue, and impose upon it a fine of not less than 50,000 Yuan but not more than 300,000 Yuan. If the circumstances are serious, it shall be imposed a fine of not less than 300,000 Yuan but not more than 500,000 Yuan. And the administrative department of industry and commerce shall revoke the business license of the branch of any direct selling company which has illegal operation acts, till the direct selling license of the direct selling company is revoked by the competent commerce department of the State Council.

Article 43

Where a direct selling company or any of its direct selling salesmen violates the provisions of the present Regulations by committing fraudulent, misleading and other drumbeating and sales promotion acts, the direct selling company shall be imposed a fine of not less than 30,000 Yuan but not more than 100,000 Yuan by the administrative department of industry and commerce; if the circumstances are serious, it shall be imposed a fine of not less than 100,000 Yuan but not more than 300,000 Yuan. And the administrative department of industry and commerce shall revoke the business license of the branch of any direct selling company which has illegal operation acts, till the direct selling license of the direct selling company is revoked by the competent commerce department of the State Council. The direct selling salesman shall be imposed a fine of less than 50,000 Yuan by the administrative department of industry and commerce; if the circumstances are serious, the direct selling company shall be ordered to revoke the qualification of the said direct selling salesman.

Article 44

Where a direct selling company or any of its branches recruits direct selling salesmen in violation of the present Regulations, it shall be ordered to make corrections by the administrative department of industry and commerce, and imposed a fine of not less than 30,000 Yuan but not more than 100,000 Yuan. If the circumstances are serious, it shall be imposed a fine of not less than 100,000 Yuan but not more than 300,000 Yuan. And the administrative department of industry and commerce shall revoke the business license of the branch of the direct selling company that has illegal operation acts, till the direct selling license of the direct selling company

is revoked by the competent commerce department of the State Council.

Article 45

Anyone, who violates the provisions of the present Regulations and undertakes direct selling activity without obtaining the certificate of direct selling salesman, shall be ordered by the administrative department of industry and commerce to make corrections, and shall be subject to the confiscation of its direct selling products and illegal sales income as well as a fine of less than 20,000 Yuan. If the circumstances are serious, he shall be imposed a fine of not less than 20.0     Yuan but not more than 200,000 Yuan.

Article 46

Any direct selling company that carries out the vocational training of direct selling salesmen in violation of the provisions of the present Regulations shall be ordered by the administrative department of industry and commerce to make corrections, and shall be subject to the confiscation of its illegal gains as well as a fine of not less than 30,000 Yuan but not more than 100.0     Yuan. If the circumstances are serious, it shall be imposed a fine of not less than 100,0     Yuan but not more than 300,000 Yuan. And the administrative department of industry and commerce shall revoke the business license of the branch of the direct selling company that has illegal business acts till the direct selling license of the direct selling company is revoked by the competent commerce department of the State Council. The teaching staff members shall be imposed a fine of less than 50,000 Yuan, and if they are the direct selling trainers, the direct selling company shall be ordered to revoke their qualifications as a direct selling trainer.

If an entity or individual outside a direct selling company organizes the vocational training of direct selling salesmen, the administrative department of industry and commerce shall order it/him to make corrections, confiscate its/his illegal gains, and impose upon it/him a fine of not less than 20,000 Yuan but not more than 200,000 Yuan.

Article 47

Where a direct selling salesman violates the provisions of Article 22 of the present Regulations, the administrative department of industry and commerce shall confiscate his/her illegal sales income, and impose upon him/her a fine of less than 50,000 Yuan. If the circumstances are serious, the direct selling company concerned shall be ordered to revoke his/her qualification as a direct selling salesman, and shall be imposed upon a fine of not less than 10,000 Yuan but not more than 100,000 Yuan.

Article 48

Any direct selling company that violates the provisions of Article 23 of the present Regulations shall be punished in accordance with the relevant provisions of the price law.

Article 49

15

Where a direct selling company violates the provisions of Articles 24 and 25 of the present Regulations, the administrative department of industry and commerce shall order it to make corrections and impose upon it a fine of not less than 50,000 Yuan but not more than 300,000 Yuan. If the circumstances are serious, it shall be imposed a fine of not less than 300,000 but not more than 500,000 Yuan. And the administrative department of industry and commerce shall revoke the business license of the branch of the direct selling company that has illegal business acts, till the direct selling license of the direct selling company is revoked by the competent department of commerce of the State Council.

Article 50

Where a direct selling company fails to report and disclose information according to the relevant provisions, the administrative department of industry and commerce shall order it to make corrections within a prescribed time limit, and impose upon it a fine of less than 100,000 Yuan. If the circumstances are serious, the administrative department of industry and commerce shall revoke the business license of the branch of the direct selling company that has illegal business acts, till the direct selling license of the direct selling company is revoked by the competent department of commerce of the State Council.

Article 51

Where a direct selling company violates the relevant provisions of Chapter V of the present Regulations, the administrative department of industry and commerce shall order it to make corrections within a prescribed time limit, and impose upon it a fine of less than 100,000 Yuan. In case it refuses to make corrections, it shall be imposed upon a fine of not less than 100,000 Yuan but not more than 300,000 Yuan, and its direct selling license shall be revoked by the competent commerce department of the State Council.

Article 52

In case any illegal act violates the Regulations on Prohibiting Pyramid Selling as well as the present Regulations, it shall be punished in accordance with the relevant provisions of the Regulations on Prohibiting Pyramid Selling.

Chapter VIII Supplementary Provisions

Article 53

If a direct selling company plans to establish a direct selling company association and other social organizations, it shall seek approval from the competent commerce department of the State Council and shall, upon the strength of the approval document, apply for registration according to law.

Article 54

The relevant provisions on foreign investors of the present Regulations shall be complied with,

when the investors of Hong Kong Special Administrative Region, Macao Special Administrative Region and Taiwan region invest in establishing direct selling companies within China and undertakes direct selling activities.

Article 55

The present Regulations shall go into effect as of December 1st, 2005.